Thurman, J.
The assignments of error in the bill of review are numerous, but may all be comprehended under a few heads.
I. It is said that the bill of the complainants below should have been dismissed, because they have recovered no judgment at law against Lewis.
This proposition rests up>on an assumption that the bill was a creditor’s bill, under the chancery practice act, to reach equities. This is a mistake. It, was, for the most part at least, a bill to enforce the execution of trusts, or to make a trustee account. Lewis had transferred his store of goods to Gilbert upon certain trusts, in one of which the complainants below were beneficially interested. He had also assigned to Gilbert the contract for the Lowe property for the express purpose of indemnifying said comjdainants. They 148] *had a right, therefore, to call him to an account in respect to these matters, and it was not at all necessary, before doing so, to obtain a judgment against Lewis. The jurisdiction' of courts of equity over trusts' and trustees is plenary. ’ It is true that the bill contained other allegations besides those relating to the trusts, of which the complainants were beneficiaries. It averred that Gilbert fraudulently held in his possession, in trust for Lewis, a large amount of real and personal estate, and was also largely indebted to him, and it sought to subject this property and .indebtedness to the payment of the conxplainants’ claims. But the decree complained of does not rest upon these averments. It is founded solely upon the trusts, of which the complainants wore beneficiaries. It matters not, therefore, whether the property and indebtedness, in which they had no interest as cestui que trusts, could or could not have been reached without a judgment being first recovered against Lewis. It is sufficient that they.were not reached.'
But let it be-supposed that the decree had subjected them, would it bo reversible because no judgment had been recovered ? We are *149 not prepared to say so. Lewis neither objected to the jurisdiction, , nor denied his liability7. Gilbert, instead of demurring, answered fully. Both. parties took testimony, the cause was referred to a master, the parties appeared before him and exhibited their proofs, first an interlocutory, and then a final deed was rendered, and yet, at no time during the litigation, although it lasted many years, was an objection raised to the jurisdiction, at least none appears in the record. Nor does it appear that, at any time, the point was made that no judgment had been recovered; nor, indeed, is that point specifically made in the bill of review. It first makes its appearance in the argument of counsel in this court. Under these circumstances, we think it comes too late. It should have been made at least in the final hearing in the common pleas, if not sooner, and if not made, the court were not bound, saa sponte, to notice it.
*11. It is said that Calvin G. Sutliff alone was damnified, [149 and his injury gave no right of action to the other complainants.
Were this admitted, it would only show a misjoinder of parties. Bui a court is not bound to dismiss a bill on account of a misjoinder, where the defect is not specifically pointed out. It may do so sua sponte, or it may not. It rests in its second discretion, which it shall do.
It is not true, however, that Calvin G. Sutliff was the only person damnified. We have decided, at this term, in Acheson v. Miller, that by the judgment and satisfaction thereof in the action of ,trespass, the title to the goods that were levied on, vested, in the complainants, and the decedent, Wilcox, and that their title related to the time of the trespass. It was their goods, therefore, that went to pay Lewis’ debt, and to the extent to which the debt was satisfied by them, they were damnified, and acquired a just claim upon him. Now it was this sum, precisely, that the court found in their favor, dividing it between the four, and in favor of Calvin G. Sutliff alone, it found the additional sum for which his farm sold. This was entirely correct.
III. It is next assigned as error, that “ the court refused to allow Gilbert any compensation for turning the goods into money, when the master allowed him, on proof, #750.”
We can not say that the court erred in this. As a general rule a ¡trustee is nor entitled to compensation, in the absence of an agree.ment to pay ; he may claim for expenses, but he must render his’ account, and, if not admitted, must clearly establish it; if he mal *150 administer, and refuse to account, both compensation and expenses may be refused. Now, in this case, Gilbert did maladminister, and also fail to account, and it was only at the end of a long litigation, and by the decree of a court, that he was made to responds He, doubtless, caused the beneficiaries of the trusts much more expense than he incurred in their execution. Under all these circumstances appearing in the case, we think the item was properly rejected.
150] *Lastly. It is claimed that the court erred in charging Gilbert with §4,000 as the value of Lewis’ interest in the Lowe property at the time he (Gilbert) refused to have it sold.
Lewis held an equitable interest in that property, under a contract of purchase from Leicester King. He transferred it to Gilbert to secure payment of the bank debt, and save Gilbert and his indorsers harmless. The transfer was evidenced by a blank indorsement upon, the contract, and a separate written agreement, both which were delivered to Gilbert, and constituted but one transaction. Their effect was to vest in Gilbert the equitable eitate tipon the trusts declared in the agreement, and to create a power to sell, to be exercised by the sheriff. As the estate was but equitable, it might well be assigned, and such a power created, without the formalities of a deed. The clause, creating the power and directing a sale, is in these words:
“ It is further expressly understood by me, Garry Lewis, that if an execution should bo issued against any of the persons above mentioned, whereby they, or either of them, may be bound to turn out property to the sheriff, in consequence of their liability to said bank on said debt of $5,000, above named, and that I, Garry Lewis, am informed of the same, and do not immediately pay the amount demanded by said sheriff, or turn out sufficient property to satisfy said execution, then the King contract, which is given as security, is to be delivered to the sheriff on said execution, and sold to pay said debt.”
» Now this contingency did occur. An execution was issued against the indorsers, among whom were the complainants and Wilcox. Lewis was informed of it, but failed to make payment, or turn out property. These facts were communicated to Gilbert, by the attorney of some of the indorsers, and he was required to deliver the King contract to the sheriff, that the latter might exercise his power to sell. He refused to do so, and thereby prevented a sale. *151, 152 To justify this refusal, various excuses are now offered, some of which seem to be after-thoughts, for nothing was heard of them at the time.
¿¿First. It is said, that the demand upon him was not made [151 by all the indorsers. It was not necessary that it should be. Any one of them had a right to make it.
Secondly. A receipt which he had given to the indorsers, showing the terms on which he held the contract, was not redelivered to him. But he did not ask its delivery. He said nothing, about it. If that was the reason of his refusal he should have so stated, and it would doubtless have been obviated. But we have no idéá that he refused upon any such ground.
Thirdly. He says that he doubted the power of the sheriff to Sell. Suppose he did, what right did that give him to hold on to the contract? The trust he had undertaken required him to deliver it up. There could be no doubt of that. When he refused, he did so at his peril. True, a trustee, may not be accountable for an honest mistake, but when his duty is so plain that no man of ordinary intelligence could mistake it, he is responsible if he has such intelligence. Besides, if Gilbert had such a doubt, why did he not take some pains to have it solved ? It surely can not be that a trustee can shield himself from responsibility by doubts that he takes no measures to either verify or dispel.
Fourthly. It is said that the sheriff could not have sold the estate upon an execution, and, therefore, the direction to deliver it to him, upon the execution,' was nugatory. It is true, that he could not have levied upon it, but the power authorized him to sell it, and this power was not defeated, or prejudiced, by the expression that the contract should be “ delivered ” to him “ on said execution.” If anything more than a sale and a delivery of the contract, indorsed as it was to the purchaser; would have been necessary to pass title, it would have been supplied by an assignment by Gilbert, to whom the estate had been transferred upon trusts, one of which was that it should be thus sold. And it would have been his duty to make such assignment, especially as he could have done so without incurring responsibility.
*Fifthly. It is urged that the property would have been sac- [152 rifieed by a sale. There is not a tittle of evidence that warrants this assumption. Besides, Gilbert had mo discretion given him to *153 determine when or how a sale should take place. The agreement was unconditional, that if the contingency should occur, which did occur, the contract should be delivered to the sheriff in order that it might sell.
Sixthly. It is said that the complainants might have filed a bill in chancery, and thus effected a sale. We do not see how this excuses Gilbert. He had no right to require them to do so. If he doubted the power of the sheriff to sell, or thought that the property would be sacrificed, unless sold under a decree of court, why did he not file a bill himself? He was trustee, and also a cestui que trust. If he wished to make tho property available for the purpose for which it was assigned, and especially if he considered it necessary for his own indemnity, as he pretended, why did he not take the steps which he now says were necessary; instead of this, he would do nothing but hold on to the contract; he neither suffered the property to be sold by the sheriff, nor effected a sale in any other way. He so managed, that out of a valuable estate that would, probably, almost or quite have saved Lewis’indorsers harmless, and which was assigned to him for that purpose, not one cent was realized by them.
Lastly. It is claimed that Gilbert had a right to retain the contract for his own security; and, strange as it may seem, after the numerous excuses we have been considering, this is the only reason he gave, at the time, for refusing to deliver it up. He did not, indeed, expressly assert a right, but said “ that he must retain it for his own security.” This was a plain and palpable violation of his duty, he being bound to deliver it up on the happening of the contingency before mentioned. Indeed, it is impossible for us, upon the testimony, to reconcile his conduct with a disposition to. act fairly. He not only prevented a sale at the time of which I have been speaking, which was in the early part of 1836, but moro than 158] two years afterward, in the spring of 1838, when *Oalvin G. Sutliff’s farm was under execution, and after he had had the most ample time to ascertain his duty, if he were in doubt about it, he again refused to surrender the contract. And, finally, King, tho vendor, was allowed to repossess himself of the property, but by what arrangement, the master was unable to report, as it was not explained; and the whole security became lost to the indorsers. Under all these circumstances, we can not say that the court erred *154 in holding Gilbert accountable, as they did, and we do not think they estimated the value of Lewis’ interest in the property too high.
But if the charge for the Lowe property were rejected, still the decree could not be reversed unless, upon the whole case, the sum decreed was too great. That, even rejecting that item, it was not too great, is, we think, manifest. Gilbert, in September, 1832, purchased a mortgage, called the Cone mortgage, executed by one Lambert W. Lewis, the debt secured by which, had been reduced by payments until not over $800 were due, including the cost of a bill to foreclose. We are satisfied he paid not over that sum for it; yet, in the January following, he made a sale, or pretended sale, of the mortgage, to Garry Lewis, for $2,884.14, and took his notes for that amount. Two of these notes, amounting to $2,000, exclusive of interest, formed part of the consideration of the purchase of one of the farms which Garry Lewis, about the time of his failure, at the beginning of 1836, conveyed to Gilbert; and they are so credited to Gilbert in the master’s report. Now, we are satisfied that this transaction, so far as these notes are concerned, was a sham. We do not believe that Lewis ever, in good faith, agreed to pay $2,884.14 for a mortgage, upon which he knew that but about $800 were due. The testimony shows that for some years before his failure, he was largely indebted, that his transactions with Gilbert were very numerous, and that, in the end, Gilbert became possessed of nearly the whole of his real and personal estate. That he was disposed to cover up his property we are well satisfied, and that he looked to Gilbert-to aid him *is more" [154 than probable. At all events, as Gilbert was allowed to retain the farm, he might well have been charged with said $2,000, and the interest thereon, forming a pretended, but not real, payment toward its purchase.
Again, the assignment of the goods to Gilbert was to indemnify him as surety for Lewis, to Henry Wick, John W. Seeley, Francis Freeman, and George Parsons, respectively, and also a surety upon the bank debt. By a provision of the assignment, Gilbert was authorized to sell the goods, and ap ly the proceeds, first, to satisfy Freeman ; next, Wick; then the bank. But the master, and the court below apparently overlooked this, and allowed the bank debt to be postponed, not to Freeman and Wick only, but also to Seeley and Parsons. The consequence was, that $1,569.95 was credited to Gilbert, as having been paid to Seeley and Parsons, which *155 should have been paid on the bank debt. This sum, and the $2,000 and interest before mentioned, approximate the amount, $4,000, charged for the Lowe property. Other items might be shown that would more than make up the difference. Suffice it to say, that we are fully satisfied, after a careful examination of the testimony, that the decree was not for too large a sum, even were the charge for the Lowe property rejected. In any aspect of the case, the bill must be dismssed.
Eanney, J\, having been of counsel, did not participate in the decision of this cause.